# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | CRIMINAL NO. GLR-14-218 |
| LEONARD MCLEAN, | * | |
| | * | |
| Defendant. | * | |

...oooOooo...

## GOVERNMENT'S RESPONSE TO DEFENDANT
## MCLEAN'S MOTION TO SUPPRESS EVIDENCE

November 25, 2014

Christopher J. Romano
Matthew C. Sullivan
Assistant United States Attorneys
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

# TABLE OF CONTENTS

I.     PROCEDURAL BACKGROUND ................................................................................1

II.    FACTUAL BACKGROUND ...................................................................................2

       A.  Investigation ...............................................................................................2

       B.  Cell-site Orders ...........................................................................................4

       C.  Traffic stop of March 18, 2014 ...................................................................4

III.   ARGUMENT ...........................................................................................................6

       A.  The Orders were based on valid findings of probable cause, and in any event
           law enforcement acted in good faith ......................................................................7

           1.  The Circuit Court for Baltimore County issued the Orders based on
               valid probably cause findings ................................................................7

           2.  Exclusion is not warranted where law enforcement relied in good
               faith on the Orders issued by the Circuit Court for Baltimore County ...10

       B.  Law enforcement obtained cell-site records in a manner consistent with the
           Fourth Amendment, and in any event suppression would be improper ...............13

           1.  The Circuit Court for Baltimore County issued valid Orders
               authorizing the collection of prospective cell-site records ....................14

               a.  The Orders complied with all constitutional requirements of a
                   warrant ......................................................................................14

               b.  The Orders authorized the collection of the prospective cell-site
                   information that law enforcement obtained here ..........................16

           2.  The collection of cell-site information did not implicate the Fourth
               Amendment ...........................................................................................19

           3.  Even if the statutory provisions or McLean's rights were violated,
               exclusion is an improper remedy ...........................................................29

               a.  Statutory violations cannot result in suppression ..........................29

               b.  Law enforcement obtained cell-site information in good faith
                   reliance on the Orders issued by judges of the Circuit Court for

Baltimore County and on federal and state statutes......................30

C.  No Fourth Amendment violation occurred in connection with the traffic stop
and subsequent canine sniff on March 18, 2014....................................................33

1.  The traffic stop was consistent with the Fourth Amendment ................33

2.  The Fourth Amendment permitted McLean's detention to complete
the traffic stop and conduct the canine scan ..........................................38

a.  No Fourth Amendment violation occurred because routine
traffic stop procedures remained in progress at the time of the
canine sniff....................................................................................38

b.  Any delay was *de minimis* ..........................................................39

c.  Any brief detention of McLean that was necessary to allow the
canine unit's arrival was justified by reasonable suspicion of
drug activity ................................................................................40

d.  The facts of *Rodriguez* bear little resemblance to this case ..........42

3.  The search of McLean's vehicle was based on probable cause..............43

IV.  CONCLUSION.......................................................................................................45

CERTIFICATE OF SERVICE ........................................................................46

Exhibit 1: Order, application, and affidavit submitted to the Circuit Court for Baltimore County,
December 2013.

Exhibit 2: Order, application, and affidavit submitted to the Circuit Court for Baltimore County,
February 2014.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. GLR-14-218** |
| **LEONARD MCLEAN,** | * | |
| | * | |
| **Defendant.** | * | |

...oooOooo...

**GOVERNMENT'S RESPONSE TO DEFENDANT
MCLEAN'S MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Christopher J. Romano and Matthew C. Sullivan, Assistant United States Attorneys for said district, submits this response in opposition to the motion to suppress evidence filed by defendant Leonard McLean.   The government respectfully requests that the Court deny McLean's motion in its entirety.

## I.      PROCEDURAL BACKGROUND

On May 7, 2014, a federal grand jury returned a one-count indictment alleging that, on or about March 18, 2014, McLean unlawfully possessed with intent to distribute 500 grams or more of a mixture or substance containing cocaine.   The defendant had an initial appearance and arraignment on May 21, 2014 and pleaded not guilty.   ECF 6.   On June 6, 2014, McLean filed a motion to suppress all evidence obtained as a result of a traffic stop of his vehicle on March 18, 2014.   *See* ECF 12.   The defendant subsequently obtained new counsel, who, on October 13, 2014, filed a supplemental memorandum in support of the motion to suppress.   *See* ECF 29 ("Supp. Mem.").   A hearing on McLean's motion is scheduled for February 27, 2015.

1

## II.   **FACTUAL BACKGROUND**

This case arises from a drug trafficking investigation that identified Leonard McLean as a source of supply.   On March 18, 2014, McLean was stopped on Interstate 95 in Maryland due to an illegal window tint on his vehicle.   After a positive canine alert, McLean's vehicle was searched, which revealed that he was transporting approximately three kilograms of cocaine.

### A.  **Investigation**

In July 2013, Detective Steven Sodd of the Baltimore County Police Department met with a confidential informant ("CI"), who identified, by name, an individual (referred to here as "Target 2") who was "actively selling large amounts of Cocaine and Marijuana."   *See* Exh. 1 at 7; Exh. 2 at 7.[1]   Det. Sodd presented the CI with a photograph of Target 2 from records of the Maryland Motor Vehicle Administration ("MVA"), and the CI confirmed that the individual portrayed was the CI's direct source of cocaine and marijuana.   *Id.*   Additionally, the CI "informed Detective Sodd that the Cocaine and Marijuana source for [Target 2] is a heavy set black male subject [who] is known as FATMAN / FATS."   *Id.*   The CI "further advised that FATS is a heavy set Jamaican who travels to New York frequently."   *Id.*   As explained below, this source of supply for Target 2 was subsequently determined to be Leonard McLean.

Between August and November of 2013, law enforcement oversaw four controlled purchases of cocaine or marijuana by the CI from Target 2.   Exh. 1 at 8–12; Exh. 2 at 8–12.   On each occasion, law enforcement conducted surveillance while the CI and Target 2 met at predetermined locations and completed hand-to-hand transactions for predetermined quantities of cocaine or, in one instance, marijuana.   *See id.*   Law enforcement searched the CI and the CI's

---

[1] As further addressed below, the two exhibits attached to the government's brief contain materials submitted to the Circuit Court for Baltimore County, including two affidavits of Det. Sodd that are cited in the Factual Background section.

vehicle before and after each controlled purchase to verify that they were free of money and contraband, and would debrief the CI to confirm that the CI had purchased drugs from Target 2. *See id.* These controlled purchases served to establish the CI's credibility, by corroborating the information that the CI was providing.

Law enforcement also confirmed that a cell phone number for Target 2 that the CI supplied was, in fact, subscribed in Target 2's name. Exh. 1 at 8; Exh. 2 at 8. With the authorization of a grand jury subpoena, Det. Sodd examined call detail records for Target 2's cell phone. *Id.* In doing so, Det. Sodd noted the presence of one particular New York-area phone number, (718) 909-6601, found to be subscribed to Leonard B. McLean of Brooklyn, New York. *Id.* To verify McLean's identity, Det. Sodd presented a photograph of McLean to the CI, who confirmed "that the subject depicted in the image 'looks like' FATMAN," who the CI had identified as Target 2's source for cocaine and marijuana. Exh. 1 at 9; Exh. 2 at 9. In addition, Det. Sodd determined that McLean had been arrested in 2011 for possession with intent to distribute a controlled dangerous substance ("CDS"), and that McLean was later convicted and sentenced on that charge. *Id.* Analysis of Target 2's cell phone records also reflected other contacts with individuals known to have been involved with cocaine distribution and who, like McLean, law enforcement believed were participants in Target 2's drug distribution organization. *See* Exh. 1 at 11; Exh. 2 at 11.

Further, law enforcement determined that McLean may reside at 421 Valley Meadow Circle in Reisterstown, Maryland, an address he had used in connection with a prior arrest. Exh. 1 at 12; Exh. 2 at 12. In September 2013, a DEA Task Force Officer observed a vehicle, registered to McLean, parked at that address. *Id.* In December 2013, the officer returned with a canine unit, which scanned McLean's vehicle and "alerted positive, indicating that the vehicle was contaminated with the scent of illegal narcotics." *Id.*

### B.  Cell-site Orders

In the course of this investigation, law enforcement obtained two court orders (the "Orders") that authorized the collection of, among other things, cell-site records for a cell phone number subscribed to McLean.   To obtain the Orders, two applications supported by sworn affidavits of Det. Sodd were submitted to the Circuit Court for Baltimore County.   *See* Exh. 1 and 2.   Upon findings of probable cause, the Circuit Court issued the two Orders, on December 26, 2013 (the "Original Order," Exh. 1 at 2–3) and February 11, 2014 (the "Extension Order," Exh. 2 at 2–3).   Because the Extension Order covered a 60-day period, it remained in effect on March 18, 2014— the day McLean's vehicle was stopped and found to contain cocaine.   As further discussed below, the Orders authorized law enforcement to obtain records about incoming and outgoing calls from McLean's cell phone, including the location of the cell phone tower(s) used for those calls.   *See, e.g.*, Extension Order (expressly authorizing a "Pen Register/Dialed Number Recorder"; "beginning and ending tower locations"; "Cellular Site Identification information"; and "Precision Location or Global Positioning System information").

### C.  Traffic stop of March 18, 2014

On March 18, 2014, while law enforcement was monitoring this cell-site information obtained pursuant to the Extension Order, Det. Sodd noticed that McLean's cell phone was moving northbound from Baltimore, on a path consistent with travel on Interstate 95.   Because one of McLean's vehicles remained in Reisterstown, Maryland, law enforcement determined that McLean was operating another of his vehicles, a dark green Chevrolet Avalanche.   The cell-site information indicated that McLean traveled to New York City, where he remained only briefly before returning southbound on Interstate 95.   McLean's route was similar to an earlier, brief trip he made in mid-February 2014.   Although law enforcement placed two calls to McLean's cell

phone on March 18, 2014, cell phone records reflect dozens of other communications to and from McLean's phone that day.   Throughout the afternoon and evening, Det. Sodd periodically checked the cell-site records to determine McLean's general whereabouts, including McLean's return to Maryland.

The Maryland State Police ("MSP") was asked to locate McLean's vehicle on Interstate 95 and, if a valid traffic violation was observed, to stop the vehicle.   In particular, MSP Trooper Scott Sander learned that McLean was traveling southbound from New York on Interstate 95 in a green Chevrolet Avalanche bearing a Maryland registration of 8AW4238, in Cecil County, Maryland. Trooper Sander also learned that law enforcement believed McLean may have been transporting narcotics.   At approximately 7:38 p.m., Trooper Sander observed a vehicle matching that description, traveling southbound on Interstate 95 across the Tydings Bridge, which lies between Cecil County and Harford County, Maryland.   While driving alongside the vehicle, Trooper Sander observed an illegal tint in the front window area and conducted a traffic stop of the vehicle near mile marker 89.   Within approximately one minute of the stop, Trooper Sander requested the assistance of a canine unit.

Upon approaching the vehicle, Trooper Sander observed several factors that he believed were indicative of criminal activity.   Specifically, Trooper Sander noticed a strong odor coming from multiple air fresheners that had been placed throughout the vehicle.   He also observed that the vehicle had the appearance of having been lived in.   Although the vehicle was registered in Maryland, the driver presented a New York driver's license, which identified him as Leonard B. McLean, the defendant.   When Trooper Sander asked McLean where he was traveling from, McLean stated he had been picking up home remodeling materials in New Jersey—which was contrary to information provided to Trooper Sander that McLean had been in New York.

5

Trooper Sander returned to his own vehicle to prepare a citation for the tint violation.   He also initiated checks of McLean's license, registration, and record, and requested that his barracks confirm that information.   While Trooper Sander was awaiting the response from his barracks, Corporal Joseph Cooper of the Havre de Grace Police Department and his canine partner, Zigo, arrived at the scene, at approximately 7:56 p.m.   By approximately 8:00 p.m., a canine scan of McLean's vehicle had been completed, which resulted in a positive alert to the presence of CDS in the area of the front passenger-side and driver-side windows, which were open.   Trooper Sander advised McLean that the vehicle would be searched due to the positive alert.   When asked whether narcotics were present in his vehicle, McLean said no.

McLean's vehicle was searched, which revealed a trap in the center console.   The trap contained two large, heat-sealed bags of white powder, believed to be cocaine.   Also discovered there was another large, heat-sealed bag containing white powder, suspected to be cocaine, and darker powder capsules, initially suspected to contain heroin but later found to contain cocaine. A small, clear bag containing white powder, suspected to be cocaine, was also found in the trap. Those items were seized and their contents tested, which revealed that they contained a total of approximately three kilograms of cocaine.

McLean was placed under arrest and handcuffed.   A subsequent inventory search of McLean's vehicle revealed a number of items, including two checks written to McLean and an MSP repair order dated October 8, 2013, requiring McLean to correct his illegally tinted windows.

**III.   <u>ARGUMENT</u>**

McLean raises three sets of challenges in his motion and supplemental memorandum. First, he argues that the applications and affidavits submitted to obtain the Orders failed to establish probable cause.   Second, McLean contends that the Orders were overbroad and did not

allow law enforcement to obtain prospective or real-time location-related information.   Third,

McLean raises a host of challenges pertaining to the basis for the traffic stop, its duration, and the

canine sniff that preceded the search of his vehicle.   Because none of those arguments are

meritorious, the motion to suppress should be denied.

### A.  The Orders were based on valid findings of probable cause, and in any event law enforcement acted in good faith.

#### 1.  The Circuit Court for Baltimore County issued the Orders based on valid probable cause findings.

McLean contends that the Orders were issued based on what he characterizes as "bare

bones" affidavits that failed to establish probable cause.[2]   For instance, McLean claims that the

Original Order resulted from "uncorroborated information from an informant whose reliability and

basis of knowledge, if any, was not disclosed to the issuing judge."   Supp. Mem. at 8.   Similarly,

McLean challenges the Extension Order on the ground that it was based solely on the affiant's

statements that McLean's cell phone was being used to contact "unidentified individuals who,

either presently or at some undefined time in the past, were 'known' to be involved in the

distribution of controlled substances."   Supp. Mem. at 8.   McLean is incorrect.

The Fourth Amendment protects against unreasonable searches and seizures, and mandates

that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized."   U.S.

Const. amend. IV.   Although the concept of probable cause cannot be defined precisely, it

"exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable

prudence in the belief that contraband or evidence of a crime will be found" in the place to be

---

[2]  Although a showing of probable cause was not necessary to permit the collection of the cell-site information at issue, the Orders were based on such a finding.   *See* Exh. 1 at 2; Exh. 2 at 2 (Orders issued "upon a finding of probable cause").

searched.   *Ornelas v. United States*, 517 U.S. 690, 696 (1996).   "[P]robable cause is a fluid

concept—turning on the assessment of probabilities in particular factual contexts—not readily, or

even usefully, reduced to a neat set of legal rules."   *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The Supreme Court has "specifically cautioned against 'hypertechnical' scrutiny of affidavits lest

police officers be encouraged to forgo the warrant application process altogether."   *United States*

*v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Gates*, 462 U.S. at 236).

 "Because probable cause is evaluated through a 'totality-of-the-circumstances' analysis

rooted in common sense, [a court] 'must accord "great deference" to the magistrate's assessment

of the facts presented.'"   *United States v. Monteith*, 662 F.3d 660, 664 (4th Cir. 2011) (internal

citation omitted).   A court's role in reviewing an issuing magistrate's probable cause

determination is limited to ensuring that "there was a 'substantial basis for determining the

existence of probable cause.'"   *Id.* (quoting *Gates*, 462 U.S. at 239); *see United States v. Herevia*,

2014 WL 4784321, at *8 (D. Md. Sept. 23, 2014) ("In assessing probable cause," a court "must

afford great deference to the initial judicial officer's determination.") (citing *United States v.*

*Henry*, 673 F.3d 285, 289–90 (4th Cir. 2012)).   Notably, "probable cause may be founded upon

hearsay and information received from informants."   *United States v. DeQuasie*, 373 F.3d 509,

518 (4th Cir. 2004).   "'[T]here is no set requirement that all tips be corroborated by subsequent

police investigation in order to be considered credible.   Whether subsequent corroboration is

necessary must be determined in the light of the totality of the circumstances presented by the

particular set of facts.'"   *Id.* at 519 (citation omitted).

 In the affidavits submitted to the Circuit Court for Baltimore County in December 2013

and February 2014, Det. Sodd supplied extensive information in support of law enforcement's

conclusion that McLean was using the target cell phone number in furtherance of "his illicit drug

enterprise." *See* Exh. 1 at 7; Exh. 2 at 7.   As the affidavits detail, in July 2013 a CI identified

Target 2 as selling "large amounts of Cocaine and Marijuana." *Id.*   Law enforcement verified

Target 2's identity by presenting his MVA photo to the CI, who confirmed that the individual

pictured was the CI's source for cocaine and marijuana.   *Id.*   Between August and November of

2013, law enforcement oversaw four controlled purchases of cocaine or marijuana by the CI from

Target 2, *see* Exh. 1 at 8–12; Exh. 2 at 8–12, which served to establish the CI's credibility by

corroborating the information the CI was providing to law enforcement.   *See United States v.*

*Patterson*, 406 F. App'x 773, 783 (4th Cir. 2011) (CI's controlled purchases from defendant

served to corroborate CI's statements regarding other drug activities) (citing *United States v.*

*Clyburn*, 24 F.3d 613, 618 (4th Cir. 1994)).

  In addition, the affidavits explain that the CI "informed Detective Sodd that the Cocaine

and Marijuana source for [Target 2] is a heavy set black male subject [who] is known as FATMAN

/ FATS," who the CI described as "a heavy set Jamaican who travels to New York frequently."

Exh. 1 at 7; Exh. 2 at 7.   Target 2's cell phone records, which law enforcement obtained pursuant

to court authorizations, reflected contacts with individuals known to be involved in cocaine

distribution.   Exh. 1 at 11; Exh. 2 at 11.   Those records also evidenced calls between Target 2 and

a New York-area phone number, (718) 909-6601, which was found to be subscribed to Leonard B.

McLean of Brooklyn, New York.   Exh. 1 at 8–9; Exh. 2 at 8–9.   Det. Sodd presented a

photograph of McLean to the CI, who confirmed "that the subject depicted in the image 'looks

like' FATMAN," the individual who the CI had identified as Target 2's source for cocaine and

marijuana.   Exh. 1 at 9; Exh. 2 at 9.

  Moreover, as set forth in the affidavits, law enforcement determined that McLean had been

arrested in 2011 for possession with intent to distribute CDS, and that McLean was later convicted

and sentenced on that charge. *Id.* And, law enforcement visited a Reisterstown, Maryland address that McLean had used in connection with a prior arrest, found a vehicle registered to McLean parked at that address, and, in December 2013, performed a canine scan of the vehicle that resulted in a positive alert for narcotics. *See* Exh. 1 at 12; Exh. 2 at 12.

As this summary reflects, the affidavits submitted to obtain the Orders were not "bare-bones" affidavits. To the contrary, they established a sound basis for concluding that McLean was involved in the distribution of narcotics and used the target cell phone number in connection with those efforts. Moreover, the affidavits evidenced multiple, successful efforts by law enforcement to confirm the reliability of the CI's information, including both McLean's identity, and, through the December 2013 canine sniff, McLean's connection to narcotics.

Accordingly, McLean's challenge to the Extension Order of February 2014, which was in effect at the time of the traffic stop on March 18, 2014, is unavailing. In addition to the extensive information set forth above, the February 2014 affidavit stated that "analysis of the DNR data collected from [McLean's] cell phone revealed several contacts with individuals known to have been involved and/or currently involved in the distribution of Cocaine." Exh. 2 at 13. According to Det. Sodd, those individuals participated in the same "drug distribution scheme" as McLean, which imported cocaine to the Baltimore area. *Id.* Notably, the application for the Extension Order was submitted less than 50 days after the original application, and both affidavits cited, among other things, McLean's role as Target 2's source of supply and the recent December 2013 positive canine alert on a vehicle registered to McLean. In light of this information, the affidavits submitted to obtain the Orders were sufficient to establish probable cause.

### 2. Exclusion is not warranted where law enforcement relied in good faith on the Orders issued by the Circuit Court for Baltimore County.

Even if the Court were to find that the affidavits did not establish probable cause,

suppression of evidence seized would be improper, as law enforcement had a good faith basis to rely on the Orders.   It is well-settled that "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).   In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court concluded that a court should not suppress "the fruits of a search conducted under authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Williams*, 548 F.3d 311, 317 (4th Cir. 2008) (quoting *Leon*, 468 U.S. at 922 n.23)) (further citation and quotation marks omitted).   "The deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 920).   Accordingly, under *Leon*'s good faith exception, "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" *Id.* (quoting *Leon*, 468 U.S. at 922).   This exception squarely applies to law enforcement's reliance on the Orders in this case.

Courts recognize four limited circumstances in which an officer's reliance on a warrant does not qualify as "objectively reasonable": "(1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a 'rubber stamp' for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid." *United*

11

*States v. Wellman*, 663 F.3d 224, 228–29 (4th Cir. 2011); *see Leon*, 468 U.S. at 922.   According to

the Fourth Circuit, "an allegation that a search warrant application contained grossly insufficient

information is best analyzed under the third *Leon* exclusion."   *See Wellman*, 663 F.3d at 229.[3]

However, as a general matter, "searches conducted 'pursuant to a warrant will rarely require any

deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to

establish that a law enforcement officer has acted in good faith in conducting the search.'"   *Perez*,

393 F.3d at 461 (quoting *Leon*, 468 U.S. at 922).

In an effort to circumvent *Leon*'s good faith exception, McLean insists law enforcement

relied upon a "bare bones affidavit," which is defined as "one that contains wholly conclusory

statements, which lack the facts and circumstances from which a magistrate can independently

determine probable cause."   *DeQuasie*, 373 F.3d at 521 (quotation marks omitted).   However, as

detailed above, the affidavits submitted to obtain the Orders are a far cry from "bare bones."

By way of example, in *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996), the Fourth

Circuit concluded that the good faith exception did not apply "due to the 'bare bones' nature of the

affidavit" submitted and "because the state magistrate could not have acted as other than a 'rubber

stamp' in approving such an affidavit."   *Id.* at 121 (citation omitted).   The affidavit in *Wilhelm*

relied, "with little or no corroboration," on a single telephone call from an anonymous "concerned

citizen," who the affiant merely asserted was "a mature person with personal connections with the

suspects and [who] has projected a truthfull [sic] demeanor . . . . "   *Id.* at 117–18, 120.

In stark contrast, the affidavits underlying the two Orders in this case reflect the

corroboration of information supplied by a confidential informant with whom law enforcement

---

[3] McLean plainly has not raised a challenge under the first prong cited in *Wellman*, 663 F.3d at 228–29.   To the extent his argument invokes the second or fourth prongs, such a claim would fail for the same reasons outlined below.

had multiple face-to-face meetings. *See, e.g.*, *United States v. Epps*, 467 F. App'x 184, 186 (4th Cir. 2012) (distinguishing *Wilhelm* and noting that "affiant officer corroborated, through independent investigation, a significant portion of the detailed information supplied by the informant"); *Perez*, 393 F.3d at 463–65 (distinguishing *Wilhelm* and noting, *inter alia*, that it did not involve face-to-face meetings with the informant). Significantly, law enforcement oversaw multiple controlled purchases of cocaine or marijuana by the CI from Target 2, verified the identities of Target 2 and McLean, and obtained a positive canine sniff on a vehicle of McLean's, thereby corroborating the information supplied by the CI and establishing the CI's reliability.

In short, even if this Court were to conclude that the information contained in the two affidavits was insufficient to establish probable cause, reliance on the Orders was entirely reasonable given the scope of the information set forth and the extensive corroboration evidenced by the affidavits. *See, e.g.*, *Wellman*, 663 F.3d at 229 (concluding good-faith exception applied and noting, *inter alia*, that dates contained in warrant application demonstrated that the affidavit was "not a hastily-assembled document based on a single tip" but rather the product of a weeks-long investigation). As a result, McLean has identified no valid basis for suppressing evidence obtained through the Orders.

**B. Law enforcement obtained cell-site records in a manner consistent with the Fourth Amendment, and in any event suppression would be improper.**

McLean also challenges the Orders as "[o]verbroad" and "[c]onstitutionally and [p]rocedurally [d]eficient." Supp. Mem. at 10. In essence, McLean argues that each Order "does not authorize cell-tracking information to be gathered and transmitted in real time to investigators." *Id.* at 14. He concedes that the Orders "authorize[] the use of a pen register and, perhaps, the gathering of stored communications, i.e. historical cell site information." *Id.* However, in McLean's view, the Orders "did not authorize the tracking of the target telephone on

a real time basis." *Id.*   According to McLean, investigators "intercepted and obtained real time information regarding the location of the target telephone and relied upon that information to target and stop the vehicle operated by the Defendant," and, in doing so, acted "without a properly issued cell-tracking warrant," thus rendering unconstitutional the stop of McLean and the subsequent search of his vehicle.   Supp. Mem. at 15.   However, these arguments fall flat, as law enforcement received the cell-site information pursuant to valid Orders that authorized the collection of the very information that was obtained.

> **1.   The Circuit Court for Baltimore County issued valid Orders authorizing the collection of prospective cell-site records.**

Law enforcement acquired cell-site records pursuant to valid Orders, issued by judges of the Circuit Court for Baltimore County, and which satisfied all constitutional requirements of a warrant under the Fourth Amendment.   Moreover, the Orders authorized the the acquisition of, among other information, prospective cell-site records of the type obtained here.

> **a.   The Orders complied with all constitutional requirements of a warrant.**

According to the Supreme Court, a warrant complies with the Fourth Amendment when three elements are present: the warrant must be issued by a neutral magistrate; it must be based on a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense"; and it must satisfy the particularity requirement.   *Dalia v. United States*, 441 U.S. 238, 255 (1979); *see id.* at 256 n.18 (Fourth Amendment is satisfied where "all of the indicia of a warrant . . . are present").

Here, the Orders adhere to these three constitutional requirements of a warrant.   First, the Orders were each issued by neutral judge.   In particular, the Original Order was issued by the Honorable Michael J. Finifter of the Circuit Court for Baltimore County, while the Extension

Order was issued by the Honorable Sherrie R. Bailey of that same court.

Second, as explained at length above, the Orders were issued upon well-founded findings of probable cause by the two Circuit Court judges.   As noted, the judges' determinations are entitled to "great deference" from a reviewing court, which should limit itself to confirming there was "a 'substantial basis for determining the existence of probable cause.'"   *Monteith*, 662 F.3d at 664 (quoting *Gates*, 462 U.S. at 239).

Third, the Orders describe their object with particularity.   In *United States v. Karo*, 468 U.S. 705, 718 (1984), which concerned a beeper used to determine location, the Supreme Court indicated that, to satisfy the particularity requirement, a relevant order need only "describe the object" whose location is at issue and specify "the length of time for which . . . surveillance is requested."   Here, the Extension Order authorized the collection of information pertaining to a specified "target number," (718) 909-6601, including, among other things, a "Pen Register/Dialed Number Recorder"; "beginning and ending tower locations"; "Cellular Site Identification information"; and "Precision Location or Global Positioning System information."   The authorization extended "for the duration of" each Order, specifically defined as a period of up to 60 days.[4]   Because the Orders satisfied all three constitutional requirements of a warrant, McLean has not identified any Fourth Amendment violation.

Regarding the validity of the Orders, *United States v. Wilford*, 961 F. Supp. 2d 740 (D. Md. 2013), is instructive.   In that case, the defendant moved to suppress cell-site information obtained via "pinging," but the district court rejected his Fourth Amendment argument.   The court questioned whether "pinging" constituted a Fourth Amendment search, yet assumed for the sake

---

[4] The collection of cell-site records that preceded the stop of McLean on March 18, 2014 falls within the 60-day period authorized by the Extension Order (dated February 11, 2014).

15

of argument that it did.   Nevertheless, the court concluded that the relevant orders satisfied the basic constitutional requirements of a warrant.   *See id.* at 771–72.

Here, the Orders authorizing the acquisition of cell-site records had the same attributes identified by the Supreme Court in *Dalia*, and which led the district court in *Wilford* to uphold the relevant orders:

> The applications were signed, under oath, by a law enforcement officer; identified the number of the target cellular phone and its user; generally provided adequate information obtained through the investigation to establish probable cause linking [the defendant] to criminal activity; and the orders were issued upon a finding of probable cause by a detached and neutral Maryland State judge.   That the [location-information] applications were for an "Order," as opposed to a "Warrant," is not material.

*Wilford*, 961 F. Supp. 2d at 772–73; *see Dalia*, 441 U.S. at 255.   Absent any failure to comply with these Fourth Amendment requirements, suppression is not appropriate.

### b.   The Orders authorized the collection of the prospective cell-site information that law enforcement obtained here.

McLean raises a variety of arguments challenging the validity and scope of the Orders, but none of those contentions is compelling.   To begin, McLean's claim that the Orders do not apply to location information is contrary to the plain language of the Orders.   Each of the Orders states that specified service providers are to provide the Baltimore County Police Department with "Cellular Site Identification information" and "Precision Location or Global Positioning System information, including latitude & longitude, for target number [718] 909-6601 . . . ."   Exh. 1 at 3; Exh. 2 at 3.   Moreover, the Extension Order, which was in effect at the time of the stop of McLean on March 18, 2014, expressly authorizes the provision of "beginning and ending tower locations," a clear reference to the locations of cell towers used by McLean's phone to place and receive calls—which is precisely the information that law enforcement obtained and relied upon on March 18, 2014.   *See* Exh. 2 at 2.

Likewise, McLean's suggestion that the Orders may, at most, permit the collection of historical cell-site records (i.e., predating each order) but not prospective cell-site records (i.e., postdating each order) is at odds with multiple aspects of the Orders.   In particular, the Orders allow the collection of information "for a period of not more than sixty (60) days," which, for several reasons, is clearly a forward-looking time period.   The Orders state that they "appl[y] not only to the above referenced telephone number, but to any subsequent telephone number or line assigned to replace the aforementioned telephone number or line."   By accounting for future changes to the "telephone number or line," the Orders make clear that they pertain to information generated *after* their issuance.   The Orders also do not specify any prior time period for which records were sought, which one would expect to find if the Orders applied, as McLean insists, to historical cell-site information.   In light of these aspects, it is readily apparent that the Orders authorize law enforcement to acquire prospective cell-site information of exactly the sort obtained on March 18, 2014, and *not* historical information that predated the Orders.[5]

Nor is there any merit to McLean's suggestion that the Orders must have provided specifics as to the means by which prospective cell-site records were to be collected.   Tellingly, McLean cites no authority in connection with his claim that the Orders are invalid because they contain "no parameters or limitations on the manner in which the Order[s were] to be executed to gather such real time information."   Supp. Mem. at 14.   Simply put, there is no requirement that an order authorizing the collection of prospective cell-site information must explicitly state that the information may be provided to law enforcement on a real-time basis.   In other words, McLean identifies no ground on which law enforcement, despite receiving authorization to obtain

---

[5] Exhibit 4 to McLean's supplemental memorandum, an AT&T document pertaining to the "Caller ID - Deluxe" services offered in seven states (not including Maryland), in no way undermines the clear references to location-related information found in the Orders.

prospective cell-site records, was somehow barred from receiving those records at or near the time they were being generated.

Moreover, the fact that the Orders cited statutory provisions commonly used in applications for prospective cell-site records confirms that law enforcement sought, and the Circuit Court for Baltimore County authorized, the collection of such information.   Specifically, a number of courts have permitted law enforcement to obtain prospective cell-site information through so-called "hybrid" applications, which, like the Orders here, cite to both (1) a pen register/trap and trace provision—here, Md. Code Ann., Cts. & Jud. Proc. Art. ("C.J.") § 10-4B-01 *et seq.* ("pen/trap statute"),[6] and (2) a provision of the federal Stored Communications Act ("SCA"), 18 U.S.C. § 2703(d).   *See, e.g.*, *In re U.S. for an Order Authorizing the Use of Two Pen Register and Trap and Trace Devices*, 632 F. Supp. 2d 202, 211 (E.D.N.Y. 2008); *In re Application of U.S. for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone*, 460 F. Supp. 2d 448, 461 (S.D.N.Y. 2006); *In Matter of Application of U.S. For an Order*, 411 F. Supp. 2d 678, 682-83 (W.D. La. 2006); *In re Application of U.S. for an Order for Disclosure of Telecommunications Records*, 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005).

This "hybrid theory" recognizes that cell-site records fall under pen/trap statutes, because such information is "dialing, routing, addressing, or signaling information."   *See* C.J. § 10-4B-01(c)(1), (d)(1); *accord* 18 U.S.C. §§ 3121 *et seq.* (federal pen/trap statute).   Although

---

[6] C.J. § 10-4B-01 defines "pen register" as "a device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."   *See* C.J. § 10-4B-01(c)(1).   A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."   *See* C.J. § 10-4B-01(d)(1).   Significantly, these definitions of "pen register" and "trap and trace device" exclude processes used to "obtain the *content* of a communication," but do *not* exclude the acquisition of cell-site information.   *See* C.J. § 10-4B-01(c)(2)(ii), (d)(2) (emphasis added).

federal law indicates that a pen/trap statute alone provides insufficient authority for the disclosure

of location information, *see* 47 U.S.C. § 1002(a)(2)(B) (forbidding a cell phone company from

disclosing cell-site information "solely pursuant" to a pen/trap order), further authority permitting

such disclosure is found in § 2703, which requires "a provider of electronic communication

service . . . to disclose a record or other information pertaining to a subscriber to or customer of

such service" pursuant to § 2703(d).   *See* 18 U.S.C. § 2703(c)(1).   In other words, when

employed in tandem, a pen/trap statute and § 2703(d) permit the disclosure of prospective cell-site

records.   Although the Orders here—unlike typical "hybrid" applications and orders—are based

on findings of probable cause and adhere to the constitutional requirements of a warrant, the

statutory authority relied upon in the Orders confirms that they are intended to cover prospective

cell-site information.[7]

### 2.   The collection of cell-site information did not implicate the Fourth Amendment.

McLean's suppression argument also suffers from another basic flaw: law enforcement's

---

[7] To issue an order pursuant to the Maryland pen/trap statute, or its federal analogue, a court need only find that the information will be "relevant to an ongoing criminal investigation."   *See* C.J. § 10-4B-04(a)(1); 18 U.S.C. § 3123(a)(2).   As for 18 U.S.C. § 2703(d), an order may be issued pursuant to that provision where the government "offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."   18 U.S.C. § 2703(d).   This "specific and articulable facts" standard "is essentially a reasonable suspicion standard."   *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 287 (4th Cir. 2013).   Some courts have rejected "hybrid" applications that invoke these provisions and seek prospective cell-site information based on a showing of less than probable cause.   *See, e.g.*, *In Matter of Application for an Order Authorizing the Installation and use of a Pen Register*, 439 F. Supp. 2d 456 (D. Md. 2006) (sworn affidavit establishing probable cause required to obtain prospective cell-site information); *In re Application of U.S. for an Order Authorizing Installation and Use of a Pen Register and a Caller Identification System*, 402 F. Supp. 2d 597 (D. Md. 2005) (same).   In any event, these cases have no bearing on the Orders at issue here, which were issued based on findings of probable cause, *see* Exh. 1 at 2; Exh. 2 at 2, and otherwise comply with the constitutional requirements of a warrant.

acquisition of the cell-site records falls beyond the scope of the Fourth Amendment.   Pursuant to

the longstanding "third party doctrine," a cell phone customer such as McLean has no legitimate

expectation of privacy regarding cell-site records, which are business records created and held by

the cell phone service provider.   In *United States v. Miller*, 425 U.S. 435 (1976), the Supreme

Court rejected a Fourth Amendment challenge to a third-party subpoena for bank records and

explained that such records are not an individual customer's "'private papers'" but rather are "the

business records of the banks" in which the customer "can assert neither ownership nor

possession."   *Id.* at 440.   As the Court observed, the records "pertain[ed] to transactions to which

the bank was itself a party."   *Id.* at 441.   In rejecting the challenge to the subpoena, the Court held

"that the Fourth Amendment does not prohibit the obtaining of information revealed to a third

party and conveyed by him to Government authorities, even if the information is revealed on the

assumption that it will be used only for a limited purpose and the confidence placed in the third

party will not be betrayed."   *Id.* at 443.

*Miller*'s reasoning squarely applies to cell-site records.   First, cell-site records are not a

customer's private papers.   Once a customer obtains a cell phone and activates it to place and

receive calls, he or she has no control over cell-site records relating to the phone.   Moreover,

although a customer is likely to be aware that the cell phone company will assign a cell tower to

handle a call, the customer typically does not know which cell tower is assigned to process it.

Second, cell-site records are business records of the provider.   The choice to create and store

cell-site records is made by the provider, and the provider controls the format, content, and

duration of the records it chooses to create and retain.   Third, cell-site records pertain to

transactions to which the cell phone company is a party.   The assignment of a particular cell tower

to process a call is made, in real time, by the cell phone company to facilitate the functioning of its

20

network.   Thus, under *Miller*, cell-site records are not protected by the Fourth Amendment because they are the phone company's business records rather than a customer's private papers.

The Supreme Court's reasoning in *Smith v. Maryland*, 442 U.S. 735 (1979), further demonstrates that a customer has no reasonable expectation of privacy in cell-site information.   In *Smith*, the telephone company installed a pen register at the request of the police to record numbers dialed from the defendant's telephone.   The Supreme Court held that telephone users have no subjective expectation of privacy in dialed telephone numbers and that any such expectation is not reasonable.   *See Smith*, 442 U.S. at 742–44.   The Court's reasoning in *Smith* applies with equal force to cell-site records.

Indeed, in *Smith*, the Court stated: "[W]e doubt that people in general entertain any actual expectation of privacy in the numbers they dial.   All telephone users realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed."   *Id.* at 742.   Similarly, cell phone users understand that they must send a signal that is received by a cell phone company's antenna in order for the company to route their calls to the intended recipients.

In *Smith*, the Supreme Court further held that even if the defendant had a subjective expectation of privacy in his dialed telephone numbers, "this expectation is not one that society is prepared to recognize as reasonable."   442 U.S. at 743 (internal quotation marks omitted).   The Court, explaining that it "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," concluded that the user "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business."   *Id.* at 743–44.   Here, a cell phone user voluntarily transmits a signal to a cell tower for his call to be connected, and the

21

provider thereby creates records, for its own business purposes, regarding which of its cell towers it used to complete the call.   If anything, the privacy interest in cell-site information is even less than the privacy interest in a dialed phone number; the location of the cell phone tower handling a customer's call is generated internally by the phone company and is not typically known by the customer.   For all of these reasons, a customer's Fourth Amendment rights are not violated when the phone company reveals to the government its own internal records that were never in the possession or control of the customer.

Courts have applied the principle that information revealed to a third party may be disclosed to the government in a variety of contexts.   *See, e.g.*, *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984); *Donaldson v. United States*, 400 U.S. 517, 522–23 (1971); *Hoffa v. United States*, 385 U.S. 293, 302 (1966).   Notably, the Fourth Circuit recently applied this principle to cell phone records in *United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011), and to internet subscriber information from Yahoo! Inc., in *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010).   Further, other appellate courts have applied this third-party principle to records of communications ranging from telephone billing records to ISP subscriber information to IP addresses of websites visited.   *See Reporters Committee for Freedom of Press v. AT&T*, 593 F.2d 1030, 1043 (D.C. Cir. 1978) (rejecting Fourth Amendment challenge to subpoena for telephone records and explaining that when an individual transacts business with others, "he leaves behind, as evidence of his activity, the records and recollections of others. He cannot expect that these activities are his private affair."); *United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation."); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (holding that e-mail users have no

22

reasonable expectation of privacy in the to/from addresses of their messages or in the IP addresses of websites visited).

*United States v. Jones*, 132 S. Ct. 945 (2012) does not alter the applicability of the third party doctrine of *Miller* and *Smith* in the context of cell-site records.   In *Jones*, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"   *Id.* at 949 (footnote omitted). The *Jones* majority relied on a common-law trespass theory, holding that a Fourth Amendment search takes place where, as in that case, "the Government obtains information by physically intruding on a constitutionally protected area[.]"   *Id.* at 951 n.3.   However, the *Jones* Court made clear that cases "involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis," *see Jones*, 132 S. Ct. at 953, which asks whether the government has violated a person's "reasonable expectation of privacy."   *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).   In other words, *Jones* plainly did not hold that the Fourth Amendment requires law enforcement to obtain a warrant to acquire cell-site information from a service provider—which, unlike the installation of the GPS tracker in *Jones*, involves no trespass or physical intrusion.   *See, e.g.*, *In re Application of U.S. for an Order Pursuant to Title 18, U.S. Code, Section 2703(d) to Disclose Subscriber Information and Cell Site Information*, 849 F. Supp. 2d 177, 178 (D. Mass. 2012) (finding *Jones* inapplicable to the acquisition of cell-site data because a court order "allowing the government to obtain the records does not involve any attachment of any device on any of an individual's real or personal property").[8]

---

[8]  Significantly, in *Jones*, only Justice Sotomayor suggested the reconsideration of *Smith* and *Miller*.  *See Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring).   Accordingly, *Jones* in no way limits the general principle that "when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party

Particularly in recent years, a number of courts—including in cases decided after *Jones*—have concluded that cell phone customers (such as McLean) have no reasonable expectation of privacy with respect to their location.   *See In re Application of the United States of America for Historical Cell Site Data*, 724 F.3d 600, 613 (5th Cir. 2013) ("A cell service subscriber, like a telephone user, understands that his cell phone must send a signal to a nearby cell tower in order to wirelessly connect his call . . . . Cell phone users, therefore, understand that their service providers record their location when they use their phones at least to the same extent that the landline users in *Smith* understood that the phone company recorded the numbers they dialed."); *United States v. Skinner*, 690 F.3d 772, 777–81 (6th Cir. 2012) (finding "no Fourth Amendment violation because Skinner did not have a reasonable expectation of privacy in the data given off by" a cell phone that he "voluntarily procured"); *In re Smartphone Geolocation Data Application*, 977 F. Supp. 2d 129, 146–47 (E.D.N.Y. 2013) ("Cell phone customers . . . convey geolocation data to their telephone carriers, and cannot possibly labor under the belief that their location is somehow kept secret from telecommunications carriers and other third parties . . . . [A]s to prospective geolocation data, cell phone users who fail to turn off their cell phones do not exhibit an expectation of privacy and such expectation would not be reasonable in any event."); *United States v. Graham*, 846 F. Supp. 2d 384, 401 (D. Md. 2012) (observing that *Smith* "cautions against any assumption of ignorance on the part of cellular customers"), *appeal docketed*, No. 12-4659 (4th Cir. Aug. 22, 2012).

In this case, McLean also lacked any reasonable expectation of privacy in his location because the information obtained on March 18, 2014 reflected travel on Interstate 95, a major public highway.   In *United States v. Knotts*, 460 U.S. 276, 281 (1983), the Supreme Court

---

conveys that information or records thereof to law enforcement authorities."   *Jerry T. O'Brien, Inc.*, 467 U.S. at 743.

concluded that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."   In the Court's view, the use of a beeper to track a vehicle on public roads did not constitute a search, as it merely enhanced the ability of law enforcement to observe a suspect's movements:   "A police car following [the suspect] at a distance throughout his journey could have observed him[.]"   *Id.* at 285.   Moreover, by traveling on public streets, an individual has "conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Id.* at 281–82.   Importantly, the principle that criminal defendants lack a reasonable expectation of privacy in their location while traveling on public thoroughfares, and that collecting data reflecting such travel is not a Fourth Amendment "search," remains good law notwithstanding *Jones*.   *See Skinner*, 690 F.3d at 778 ("Similar to the circumstances in *Knotts*, Skinner was traveling on a public road before he stopped at a public rest stop.   While the cell site information aided the police in determining Skinner's location, that same information could have been obtained through visual surveillance.").

McLean points to several other reasons why, in his view, the Fourth Amendment was implicated and a warrant was required, but the grounds cited are inapplicable.   For one, McLean contends that the government employed a "tracking device," the use of which requires a warrant supported by probable cause, pursuant to 18 U.S.C. § 3117 and Fed. R. Crim. P. 41.   Section 3117 provides: "If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction."   18 U.S.C. § 3117(a). Subsection (b) of § 3117 defines "tracking device" as "an electronic or mechanical device which

permits the tracking of the movement of a person or object."   As discussed above, the Orders in

this case complied with the constitutional requirements of a warrant—and, notably, § 3117

indicates that "a warrant or *other order*" may be an appropriate means of receiving authorization to

install a tracking device.   18 U.S.C. § 3117(a) (emphasis added).

Moreover, although the Fourth Circuit has not resolved the issue, numerous courts have

found—including after *Jones*—that the acquisition of cell-site information does not amount to the

use of a "tracking device" as defined in § 3117.   *See, e.g., In re Smartphone Geolocation Data*

*Application*, 977 F. Supp. 2d at 149–50 (stating that § 3117(a) indicates "the statute is aimed at

devices installed specifically to track someone or something, as opposed to cell phones which,

incidental to their intended purpose, can be tracked or traced"); *United States v. Caraballo*, 963 F.

Supp. 2d 341, 361 n.7 (D. Vt. 2013) ("Federal law governs government '*installation* of a mobile

tracking device,' 18 U.S.C. § 3117 (emphasis supplied), which simply does not occur in the

pinging process in which the government accesses a cell phone's inherent capabilities to obtain

location data without installing any device in or on the cell phone itself."); *United States v. Powell*,

943 F. Supp. 2d 759, 777 (E.D. Mich. May 3, 2013) ("Moreover, a cell phone is not a 'tracking

device' as defined by 18 U.S.C. § 3117.   First, a cell phone is not a government-owned-and-

installed device. Instead, it is a personal communications device that an individual purchases and

owns. The statutory language of § 3117 specifically contemplates government installation . . . .");

*In re Applications of U.S. for Orders Pursuant to Title 18, U.S. Code Section 2703(d)*, 509 F. Supp.

2d 76, 81 n.11 (D. Mass. 2007); *In re Application for an Order Authorizing the Extension and use*

*of a Pen Register Device*, 2007 WL 397129, at *2 (E.D. Cal. Feb. 1, 2007) ("[I]t only makes sense

to find that 18 U.S.C. § 3117(b) does not include the acquisition of cell site information in the

terms 'tracking device.'"); *In re Application of the United States for an Order*, 411 F. Supp. 2d

678, 681 (W.D. La. 2006) (because "[t]racking devices are devices that are 'installed' at the

request of the Government," a "cell phone is not a tracking device as that term is commonly

understood"); *In re Application of U.S. for an Order for Disclosure of Telecommunications

Records*, 405 F. Supp. 2d at 449 n.8.[9]

McLean relies on *In re Application of U.S. for an Order Authorizing Disclosure of

Location Information of a Specified Wireless Telephone*, 849 F. Supp. 2d 526 (D. Md. 2011), but

that case is distinct from the present one in at least two important respects.   For one, that case

involved a government request for location data that is markedly more precise than the cell-site

records obtained here.   Additionally, and as the court emphasized, the government did so for the

express purpose of executing an arrest warrant, rather than as an aid to surveillance of a defendant.

*See id.* at 530-33.

Nor does *Riley v. California*, 134 S. Ct. 2473 (2014), lend support to McLean's

contentions.   In *Riley*, the Supreme Court held that "officers must generally secure a warrant"

before searching digital information stored on an arrestee's cell phone.   *See id.* at 2485.   The

*Riley* Court expressly noted:   "Because the United States and California agree that these cases

involve searches incident to arrest, these cases do not implicate the question whether the collection

or inspection of aggregated digital information amounts to a search under other circumstances."

*Id.* at 2489 n.1.   *Riley* also leaves fully intact the third-party doctrine recognized in *Smith*; as the

Supreme Court explained, *Riley*, unlike *Smith*, undisputedly involved a search, and implicated

---

[9]  *But see, e.g.*, *In re Application of the United States for an Order Authorizing the Use of a Pen Register with Caller Identification Device Cell Site Location Auth. on a Cellular Tel.*, 2009 WL 159187, at *6–*7 (S.D.N.Y. Jan. 13, 2009); *In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority*, 396 F. Supp. 2d 747 (S.D. Tex. 2005); *In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005).

user-generated content beyond the sort of information found in a call log—or cell-site records.

*See* 134 S. Ct. at 2492–93; *see also United States v. Guerrero*, --- F.3d ----, 2014 WL 4476565, at

*8 (5th Cir. Sept. 11, 2014) ("*Riley* did not overrule . . . the Court's earlier *Smith* decision");

*United States v. Giddins*, --- F. Supp. 3d ----, 2014 WL 4955472, at *7 (D. Md. Sept. 30, 2014).

Finally, the fact that law enforcement placed two calls to McLean's cell phone on March

18, 2014 does not create a Fourth Amendment search.   These calls were placed to McLean's

phone at approximately 6:13 p.m. and 6:57 p.m.   By placing the calls, law enforcement made no

intrusion of McLean's cell phone beyond that which any other individual with a telephone could

have made.   Accordingly, those calls in no way transform law enforcement's action into a search.

*See United States v. Forest*, 355 F.3d 942, 951–52 (6th Cir. 2004) (no Fourth Amendment search

occurred where police officers dialed a suspected drug trafficker's phone, thereby allowing

government to collect cell tower information and to determine that defendant's location on public

roads), *judgment vacated on other grounds*, 543 U.S. 1100 (2005);[10] *cf. Wilford*, 961 F. Supp. 2d

at 747 (noting that "a cell phone will transmit its location information to nearby cell towers

'[w]hen the government calls the target's cell phone'" as well as when the phone "regularly

communicates with cell towers to test signal capacity" even in the absence of any calls, and

concluding that the government was permitted to obtain location information through either

method) (internal citation omitted).[11]

_____

[10] *See also United States v. Fisher*, 745 F.3d 200, 204 & n.5 (6th Cir. 2014) (confirming that Fourth Amendment aspects of *Forest* remain good law); *Skinner*, 690 F.3d at 778–79 (discussing *Forest*).

[11] In the event this Court concludes that the cell-site information generally does not implicate the Fourth Amendment, but that the information obtained as a result of the two calls from law enforcement amounted to a "search" that was not permitted under the Orders, suppression is an improper remedy given the "independent source" exception to the exclusionary rule.   *See Murray v. United States*, 487 U.S. 533, 537 (1988).   This is because, even setting aside information

### 3. Even if statutory provisions or McLean's rights were violated, exclusion is an improper remedy.

Even if this Court were to conclude that the Orders did not allow the government to obtain the cell-site information at issue here, imposition of the exclusionary rule is unwarranted. *See United States v. Leon*, 468 U.S. 897 (1984).

### a. Statutory violations cannot result in suppression.

As the Fourth Circuit has said, "there is no exclusionary rule generally applicable to statutory violations." *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (quotation marks omitted). "The availability of the suppression remedy for . . . statutory, as opposed to constitutional, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977).

No relevant federal or state statute provides for exclusion of evidence as a remedy. Regarding the Maryland pen/trap statute, the district court in *Wilford* noted that "[n]o judicial decision offers any guidance as to the scope of the Maryland statute with respect to pinging," but concluded that, even if that statute does not allow the acquisition of location-based information, suppression of the location information would be an improper remedy. *Id.* at 770 (noting that "the Maryland Code does not include a suppression remedy for evidence obtained in violation of" C.J. § 10-4B-01 *et seq.* and collecting cases).[12]

---

obtained as a result of these two calls, law enforcement was well aware of McLean's travel southbound on Interstate 95 based only upon cell-site information gleaned from numerous calls and messages that law enforcement did not initiate. Moreover, law enforcement acted in good faith when placing the two calls to McLean's phone.

[12] The district court also distinguished as "factually inapposite" cases in which the Supreme Court found suppression an appropriate remedy due to a statutory violation that implicated "important" Fourth Amendment interests. *See Wilford*, 961 F. Supp. 2d at 770 n.25.

With respect to federal provisions, numerous courts have concluded that no statutory suppression remedy exists under the SCA.   *See, e.g.*, *Guerrero*, 2014 WL 4476565, at *5; *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998).   As explained above, another provision McLean invokes, 18 U.S.C. § 3117, is inapplicable to cell-site data. However, even assuming that § 3117 does apply, and that it was violated, that provision also contains no suppression remedy.   *Forest*, 355 F.3d at 950; *United States v. Gbemisola*, 225 F.3d 753, 758 (D.C. Cir.) (noting that § 3117 "does not *prohibit* the use of a tracking device in the absence of conformity with the section") (emphasis in original), *cert. denied*, 531 U.S. 1026 (2000); *United States v. Flores*, 2007 WL 2904109, at *4 & n.1 (N.D. Ga. Sept. 27, 2007).

> **b.   Law enforcement obtained cell-site information in good faith reliance on the Orders issued by judges of the Circuit Court for Baltimore County and on federal and state statutes.**

Even if a Fourth Amendment violation occurred, exclusion is unwarranted because law enforcement acted in good faith.   Under *Leon*, 468 U.S. 897, and its progeny, exclusion is improper in light of law enforcement's good faith reliance on the Orders, as well as on underlying state and federal statutes cited in the Orders.

The Supreme Court has "repeatedly held" that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations[,]" not to remedy past ones.   *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011).   "[T]he exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'"   *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *Leon*, 468 U.S. at 909).   Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a court must find that "the benefits of deterrence . . . outweigh the costs"

before excluding evidence obtained in violation of the Fourth Amendment.   *Id.* (quotation marks

omitted); *see Davis*, 131 S. Ct. at 2427 ("Our cases hold that society must swallow this bitter pill

[of exclusion] when necessary, but only as a 'last resort.'   For exclusion to be appropriate, the

deterrence benefits of suppression must outweigh its heavy costs.") (quoting *Hudson v. Michigan*,

547 U.S. 586, 591 (2006)).

Several aspects of the Orders are particularly relevant.   For one, the fact the Orders were

issued by two neutral judges of the Circuit Court for Baltimore County establishes that reliance on

them was reasonable.   *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012)

(authorization by "neutral magistrate" provides "the clearest indication" that law enforcement

"acted in an objectively reasonable manner" such that good faith exception applies); *Leon*, 468

U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's

probable-cause determination or his judgment that the form of the warrant is technically

sufficient.").   This case plainly does not fall into the narrow exceptions to that rule, such as where

a judge has "wholly abandoned his judicial role."   *Leon*, 468 U.S. at 923.   Rather, reliance on the

Orders issued by two Circuit Court judges was eminently reasonable.

Additionally, the applications and Orders are based on state and federal statutes on which

law enforcement could reasonably rely.   In *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987), the

Supreme Court held that an officer's objectively reasonable reliance on a statute—even where a

court concludes in hindsight that the statute is constitutionally infirm—bars application of the

exclusionary rule.   "Unless a statute is clearly unconstitutional, an officer cannot be expected to

question the judgment of the legislature."   *Id.*   The Supreme Court reasoned that "penalizing the

officer for the [legislature's] error, rather than his own, cannot logically contribute to the

deterrence of Fourth Amendment violations."   *Id.* at 350.   Because law enforcement reasonably

relied on the SCA and the Maryland pen/trap statute in obtaining the Orders and acquiring cell-site information covered by those Orders, suppression would be inappropriate.   *See, e.g.*, *Giddins*, 2014 WL 4955472, at *10 (an "officer's good faith reliance on [the SCA] cures any Fourth Amendment violation that may have occurred" when government obtained cell-site information).

Other courts have applied the good-faith exception in the contexts of cell-site data and precision GPS data, including where the government has obtained prospective, real-time information.   *United States v. Espudo*, 954 F. Supp. 2d 1029, 1045 (S.D. Cal. 2013) ("[E]ven though the Government did not obtain a warrant based on probable cause prior to seeking real-time cell site location data, which this Court finds is required, this evidence is nonetheless admissible under the good faith exception."); *see United States v. Davis*, 754 F.3d 1205, 1217–18 (11th Cir. 2014) (although defendant's Fourth Amendment rights violated when government obtained historic cell-site location information, good faith exception applied because the government relied on the SCA in obtaining information), *rehearing en banc granted and opinion vacated*, 573 F. App'x 925 (11th Cir. Sept. 4, 2014); *United States v. Barajas*, 710 F.3d 1102, 1110 (10th Cir. 2013) (concluding that officers acted in good faith in obtaining GPS data even though application did not cite GPS information); *United States v. Lopez-Acosta*, 2014 WL 3828225, at *4 (D. Neb. Aug. 4, 2014); *Caraballo*, 963 F. Supp. 2d at 365–66; *United States v. Takai*, 943 F. Supp. 2d 1315, 1323 (D. Utah 2013); *United States v. Jones*, 908 F. Supp. 2d 203, 213–16 (D.D.C. 2012); *Graham*, 846 F. Supp. 2d at 406 (because it was "objectively reasonable for law enforcement to rely on the [SCA]" in obtaining historical cell-site information, suppression not warranted); *United States v. Suarez–Blanca*, 2008 WL 4200156, at *12–*13 (N.D. Ga. Apr. 21, 2008).   Likewise, suppression is not a proper remedy in this case.

**C. No Fourth Amendment violation occurred in connection with the traffic stop and subsequent canine sniff on March 18, 2014.**

McLean also challenges the basis of the March 18, 2014 traffic stop, the duration of the stop, and the canine sniff that preceded the search of his vehicle.   Because law enforcement's conduct was reasonable and consistent with the Fourth Amendment's requirements, suppression is unwarranted.

### 1.   The traffic stop was consistent with the Fourth Amendment.

"Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," a court will "analyze the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1, 19–20[] (1968)."   *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014) (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)); *see also Lewis v. State*, 920 A.2d 1080, 1087 (Md. 2007) ("A traffic stop is justified under the Fourth Amendment where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot.").   Specifically, under *Terry*, a court first determines "whether the officer's actions were justified at their inception" and, second, whether law enforcement's "subsequent actions were reasonably related in scope to the circumstances that justified the stop."   *Green*, 740 F.3d at 279 (citing *Rusher*, 966 F.2d at 875).

 Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."   *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).   Under the reasonable suspicion standard, a "minimal level of objective justification" is required.   *Id.*   Reasonable suspicion is supported by "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."   *United States v.*

*Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (internal quotation marks and citations omitted). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Id.* at 337.

Here, the stop of McLean's vehicle was proper for two independent reasons.   First, Trooper Sander's observation of illegal window tinting provided a reasonable, articulable suspicion that the car violated Maryland traffic laws.   In Maryland, "post-manufacture tinting is governed by statutes found in titles 22 and 23 of the Transportation Article of the Maryland Code." *State v. Williams*, 934 A.2d 38, 42 (Md. 2007).   Section 22-101 of the Transportation Article ("Trans.") prohibits a person from driving on any highway if the vehicle is equipped in a way that violates title 22, and a violation of § 22-101 constitutes a misdemeanor.   *Id.* at 42 (citing Trans. § 22-101(a)).

Subtitle 4 of title 22 "establishes the requirements for certain kinds of vehicle equipment," and § 22-406(i)(1)(I) "prohibits a person from operating a passenger vehicle on a highway of the State if 'there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%.'" *Id.* (citing Trans. § 22-406(i)(1)(i)).   Notably, section 22-406 provides, in part:

> If a police officer observes that a vehicle is being operated in violation of paragraph (1) of this subsection, the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order in accordance with the provisions of § 23-105 of this article.

Trans. § 22-406(i)(2).

Additionally, regulations promulgated by Maryland agencies limit the amount of tinting on vehicle windows.   Section 23-104(a) provides that vehicles must have glazing equipment "meeting or exceeding the standards established jointly by the [Motor Vehicle Administration] and the [Automotive Safety Enforcement Division of the State Police]."   *Williams*, 934 A.2d at 42–43 (citing Trans. § 23-104(a)).   Section 23-104(b)(2) "requires those agencies to adopt regulations consistent with Federal law for that kind of equipment, and they have done so."   *Id.* at 43 (citing Trans. § 23-104(b)(2)).   The adopted regulation allows post-manufacture tinting only if the tinting allows transmittance of at least 35% of light.   *See Williams*, 934 A.2d at 43 (citing Code of Maryland Regulations ("COMAR") § 11.14.02.14).   That regulation also requires "that a label stating the percentage of light transmittance be permanently attached to the window between the glass and the tinting material."   *Id.* at 43.   "[I]f a police officer observes a vehicle being driven on a highway that is not in compliance with those requirements, the officer may stop the vehicle and issue both a citation for the traffic offense and a vehicle equipment repair order."   *Id.*

Mirroring § 22-406(i)(2), § 23-105(a)(1) provides:

> If a police officer observes that a vehicle registered in this State is being operated with any equipment that apparently does not meet the standards established under this subtitle . . . the officer shall stop the driver of the vehicle and issue to him a safety equipment repair order.

Trans. § 23-105(a)(1).

Here, Trooper Sander lawfully stopped McLean after observing a traffic violation: McLean's operation of the Chevrolet Avalanche in Maryland with illegal tint material in the front window area.   Trooper Sander's observation is corroborated by a prior repair order, issued to McLean in October 2013, requiring him to correct illegal tinting.   Notably, traffic stops are

justified even when officers observe only minor violations, *see United States v. Bullock*, 94 F.3d 896, 897 (4th Cir. 1996) (stop of vehicle with cracked windshield traveling six miles per hour over posted speed limit was valid); *United States v. Jeffus*, 22 F.3d 554, 556–57 (4th Cir. 1994) (stop of vehicle with cracked windshield and a broken taillight and headlight was justified), including tint violations, *see United States v. Taylor*, 2013 WL 4461595, at *2 (D. Md. Aug. 16, 2013) (upholding stop based on tint violation).   In light of Trooper Sander's observation of a tint violation, there was ample reasonable suspicion justifying the stop of McLean's vehicle.

The underlying narcotics investigation in no way undermines the validity of the traffic stop based on the tint violation.   As McLean concedes, *see* Supp. Mem. at 8, a stop challenged as "pretextual" is permissible where there exists a valid, objective basis for stopping the vehicle. *See United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993) (holding that if an officer has probable cause or reasonable suspicion to stop a vehicle, a subsequent search will not be suppressed, even if the stop was pretextual); *see also, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 45 (2000) ("[A]n individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred.").

Rather, McLean's suspected drug activity provided law enforcement with an additional ground for stopping McLean.   Under the "collective knowledge doctrine," a law enforcement officer may conduct a traffic stop or make an arrest on the basis of information obtained by fellow officers.   *See*, *e.g.*, *United States v. Hensley*, 469 U.S. 221, 229 (1980).   As the Fourth Circuit explained in *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011), this doctrine holds that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself," such that, "in

36

this very limited sense, the instructing officer's knowledge is imputed to the acting officer."   In

multiple cases, the Fourth Circuit has applied the collective knowledge doctrine to determine

whether a traffic stop or some other investigative detention was supported by reasonable

suspicion.   *See*, *e.g.*, *United States v. Hands*, 573 F. App'x 278, 279-80 (4th Cir. 2014) (applying

collective knowledge doctrine to traffic stop); *United States v. Robinson*, 221 F. App'x 236, 241

(4th Cir. 2007) (same); *United States v. Brice*, 38 F. App'x 898, 899-900 (4th Cir. 2002)

("Reasonable suspicion . . . may be based on the collective knowledge of officers involved in an

investigation."); *see also, e.g.*, *United States v. Herevia*, 2014 WL 4784321, at *5–*6 (D. Md.

Sept. 23, 2014).

Where instructing officers have reasonable, articulable suspicion that an individual is

engaged in drug trafficking and thus requests that another officer stop a specific vehicle, the

collective knowledge doctrine applies, and the officer who actually stops the vehicle is "acting as

an extension or agent of" the instructing officers, and may "act on the [instructing officers']

suspicions."   *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987) (applying collective

knowledge doctrine to traffic stop directed by DEA and conducted by Illinois State Police

officers); *United States v. Lyons*, 687 F.3d 754, 765-69 (6th Cir. 2012) (applying the collective

knowledge doctrine, and finding that Michigan State Police troopers "clearly acted on the DEA's

directive and executed [a traffic] stop within the bounds of the DEA's reasonable suspicion"); *cf.*

*United States v. Williams*, 627 F.3d 247, 253 (7th Cir. 2010) (search of vehicle supported by

probable cause; DEA's collective knowledge imputed to Chicago Police officers who stopped and

searched vehicle).

Here, a number of details regarding McLean were, in fact, conveyed to Trooper Sander on

March 18, 2014, prior to the traffic stop.   Moreover, the Court may impute to Trooper Sander the

knowledge of the law enforcement officers who were investigating McLean on March 18, 2014,

and who requested that MSP stop McLean's vehicle based on a valid traffic violation during his

return from New York.   This knowledge of McLean's role as a source of supply, his involvement

with Target 2, and his particular movements on March 18, 2014, may be properly attributed to

Trooper Sander for purposes of the Fourth Amendment analysis.   Taken together, this

information provided law enforcement with reasonable suspicion to stop McLean's vehicle for

investigatory purposes.

> **2.   The Fourth Amendment permitted McLean's detention to complete the traffic stop and conduct the canine scan.**

McLean also contends that "the stop was continued for investigative purposes and without

lawful justification."   Supp. Mem. at 9.   Because the use of a trained narcotics-detection dog

during a lawful traffic stop does not on its own implicate privacy interests protected by the Fourth

Amendment, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *Branch*, 537 F.3d at 335–36, the

only issue is whether the duration of McLean's detention ran afoul of the Fourth Amendment.

Contrary to McLean's claims, no Fourth Amendment violation occurred.

> **a.   No Fourth Amendment violation occurred because routine traffic stop procedures remained in progress at the time of the canine sniff.**

Here, the canine sniff did not extend the duration of a valid traffic stop.   "If a police officer

observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the

driver a citation and determine that the driver is entitled to operate his vehicle."   *Branch*, 537 F.3d

at 337; *see Rusher*, 966 F.2d at 876 (during a traffic stop an officer "may request a driver's license

and vehicle registration, run a computer check, and issue a citation").   Even absent reasonable

suspicion of other criminal activity, an "officer may inquire into matters unrelated to the

justification for the traffic stop, and may take other actions that do not constitute searches within

the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle," as long as these activities "do not measurably extend the duration of the stop."   *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012) (internal citations, quotation marks, and alterations omitted). Where "the entire time before the search was occupied with traffic stop procedures," a stop does not amount to an unlawful Fourth Amendment seizure.   *Jeffus*, 22 F.3d at 557.

At the time the canine sniff of McLean's vehicle was performed, routine traffic stop procedures remained in progress.   In particular, Trooper Sander had requested that his barracks confirm license, registration, and record information regarding McLean.[13]   However, at the time the canine unit arrived, Trooper Sander had not yet received the information he requested from his barracks.   *See Green*, 740 F.3d at 280 (no Fourth Amendment violation where trooper did not immediately issue tint citation and instead awaited receipt of information from dispatch, during which time a canine sniff was performed).   As a result, the canine sniff did not extend a valid traffic stop, which remained in progress at the time of the positive canine alert.

### b.  Any delay was *de minimis*

Even if the canine sniff extended the length of the traffic stop, such a delay was *de minimis* and therefore does not render the stop unconstitutional.   *See Green*, 740 F.3d at 280 ("[W]here a delay in conducting a dog sniff can be characterized as de minimis under the totality of the circumstances, the delay does not violate the defendant's Fourth Amendment rights."); *United States v. Guijon–Ortiz*, 660 F.3d 757, 766 (4th Cir. 2011) ("'[W]e have held that where a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as

---

[13] Trooper Sander's approach in initiating the routine steps of a traffic stop stands in marked contrast to the officer in *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011).   As the Fourth Circuit explained, the officer "failed to diligently pursue the purposes of the stop" and, rather than promptly initiating a driver's license check, "embarked on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter . . . ."   *Id.* at 509.

a Fourth Amendment violation[.]'") (citation omitted); *see also United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.") (quoting *Arizona v. Johnson*, 555 U.S. 323 (2009)) (emphasis omitted).

### c. Any brief detention of McLean that was necessary to allow the canine unit's arrival was justified by reasonable suspicion of drug activity.

To the extent the Court concludes that the duration of the traffic stop was extended beyond the time consumed by the routine procedures of a traffic stop, in order to permit the completion of a canine sniff, reasonable suspicion of McLean's involvement in drug offenses permitted such a detention. It is well-settled that the police may detain a driver, thereby prolonging a traffic stop, where there exists reasonable suspicion of other criminal activity. "If a police officer wants to detain a driver beyond the scope of a routine traffic stop . . . he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336 (internal citations omitted); *cf. United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (A "dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop *and the officer lacked an independent reasonable suspicion to extend the stop*.") (emphasis added). Here, even assuming that the traffic stop was extended to allow for the canine sniff, any such delay was permissible.

As indicated, reasonable suspicion exists where "an officer is able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and particularized suspicion or hunch of criminal activity.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) (quoting *Branch*, 537 F.3d at 336) (further citation and quotation

40

marks omitted).   "When an officer has reasonable suspicion of criminal activity, he may detain

the suspect so as 'to permit the officer to allay the suspicion.'"   *Id.* (quoting *Mason*, 628 F.3d at

128); *see also Adams v. Williams*, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not

require a policeman who lacks the precise level of information necessary for probable cause to

arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.").

Here, Trooper Sander's reasonable suspicion was based on a number of factors.   To begin,

Trooper Sander observed multiple air fresheners throughout McLean's vehicle and reported a

strong odor associated with such masking agents.   *See Branch*, 537 F.3d at 337 (the "presence of

several air fresheners," which are "'commonly used to mask the smell of narcotics,'" contributed

to reasonable suspicion of illicit drug activity) (quoting *United States v. Foreman*, 369 F.3d 776,

785 (4th Cir. 2004)); *United States v. Batista*, 2011 WL 1636401, at *1 (D. Md. Apr. 27, 2011)

(pointing to testimony that "drug traffickers frequently use masking agents such as cologne and air

fresheners in an attempt to foil canine scans"); *cf. United States v. Fuse*, 391 F.3d 924, 929-30 (8th

Cir. 2004) (odor of air freshener helped "demonstrate reasonable suspicion justifying continued

detention of [the defendant] to conduct a dog sniff").   According to Trooper Sander, McLean's

vehicle also had a "lived-in look," which can "indicate criminal activity because it shows that the

driver may not want to leave the car because it may contain large amounts of money, drugs, or

weapons."   *United States v. Melendez*, 2011 WL 2462085, at *1 n.4 (D. Md. June 16, 2011).

Further, although the vehicle was registered in Maryland, McLean presented a New York

State driver's license.   Trooper Sander also was aware that McLean had been traveling south on

Interstate 95, "a major thoroughfare for narcotics trafficking," *United States v. Newland*, 246 F.

App'x 180, 188 (4th Cir. 2007); *Melendez*, 2011 WL 2462085, at *3, from New York, a "known

source city for illegal narcotics," *Foreman*, 369 F.3d at 785; *see Newland*, 246 F. App'x at 189.

41

In addition, when Trooper Sander asked McLean where he had traveled from, McLean said that he had been picking up home remodeling materials in New Jersey—a statement that contributed to Trooper Sander's suspicions, given his knowledge of McLean's travel to New York. *See United States v. Martinez-Turcio*, 494 F. App'x 354, 363 (4th Cir. 2012) (defendant's statement, perceived as a lie by officer, contributed to reasonable suspicion permitting continued detention).

Particularly when viewed in their entirety, "sufficient facts existed to have given an experienced officer a reasonable suspicion that criminal activity was afoot." *Mason*, 628 F.3d at 129. Accordingly, insofar as the traffic stop of McLean was extended to permit the canine sniff—which was not the case here, as routine procedures were not complete at the time of the sniff and positive alert—any such extension was plainly constitutional.

### d. The facts of *Rodriguez* bear little resemblance to this case.

In an effort to bolster his Fourth Amendment claim, McLean points to *United States v. Rodriguez*, 741 F.3d 905 (8th Cir. 2013), *cert. granted*, --- S. Ct. ----, 2014 WL 1766135 (Oct. 2, 2014). On appeal, Rodriguez argued that a traffic stop "was unreasonably prolonged by the dog sniff in the absence of reasonable suspicion to continue his detention." 741 F.3d at 907. Unlike in the present case, police continued to detain Rodriguez for a period of seven or eight minutes *after* the issuance of a written warning, to allow a dog sniff to be performed. *See id.* In the Eighth Circuit's view, this seven- or eight-minute delay "constituted a *de minimis* intrusion on Rodriguez's personal liberty." *Id.* at 908. Additionally, the Eight Circuit concluded that because it found "the traffic stop was not unreasonably prolonged, [it] need not decide whether [the officer] had reasonable suspicion to continue Rodriguez's detention." *Id.*

Even if the Supreme Court were to reverse the Eighth Circuit's holding, this case is different from *Rodriguez* in several important respects. As the petition for certiorari in *Rodriguez*

42

confirms, the question presented in that case is whether "an officer may extend [an] *already-completed stop* for a canine sniff *without reasonable suspicion* or other lawful justification." ECF 29-4 at 3 (emphasis added).   Here, however, routine procedures remained in progress at the time the canine sniff of McLean's vehicle was completed, and thus the duration of the stop was not extended to permit the sniff.   And, in the event the Court concludes that the stop was extended beyond the time necessary to complete routine procedures, such an extension poses no Fourth Amendment problem given that reasonable suspicion of drug activity existed.

### 3.   The search of McLean's vehicle was based on probable cause.

McLean's contention that law enforcement lacked probable cause to search his vehicle is without merit.   Under the automobile exception to the warrant requirement, if the government has probable cause to believe that a "readily mobile" car contains contraband or evidence of a crime, a warrantless search is permissible.   *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johnson*, 599 F.3d 339, 347 (4th Cir. 2010).   Assuming probable cause, law enforcement may conduct a warrantless search "that is as thorough as a magistrate could authorize in a warrant." *United States v. Ross*, 456 U.S. 798, 800 (1982).   Of relevance here, "[p]robable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, 'viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'"   *Green*, 740 F.3d at 282 (quoting *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013)).   The Supreme Court has made clear that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," and, further, that "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."   *Harris*, 133 S. Ct. at 1057.

In this case, law enforcement had probable cause to search McLean's vehicle based on Zigo's positive alert. *See, e.g.*, *United States v. Kelly*, 592 F.3d 586, 592 (4th Cir. 2010); *Branch*, 537 F.3d at 340 n.2 ("[I]t is well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause to search a vehicle.").

In his original motion (ECF 12), McLean challenges "the validity and accuracy of the dog 'hit'" based upon a supposed "large amount of currency present in the vehicle at the time of the canine scan[.]"   ECF 12 at 2, 4-5.   He notes that currency can be contaminated with drug residue, and asserts that because "canines have the ability to detect even the faintest traces of an odor," the presence of a large amount of currency can cause a "false positive" result in a canine sniff.   *Id.* at 4.   In McLean's view, currency present in his vehicle should have been removed prior to any canine scan, in order to ensure its reliability.   *Id.* at 4–5.

This argument is a red herring.   Neither the initial search performed at the location of the stop nor a subsequent inventory search uncovered large amounts of currency in McLean's vehicle. As such, the theory that large quantities of currency can affect the result of a canine sniff cannot undermine the reliability of the positive alert in this case.

Moreover, as a matter of law, McLean's argument is contrary to the Supreme Court's *Harris* opinion, which endorses the reliability of canine sniffs where, as here, the canine's qualifications can be established.   *See* 133 S. Ct. at 1057.   Insofar as McLean is pursuing a broader challenge to Zigo's reliability beyond the inapplicable claim regarding currency, ample evidence exists that establishes Zigo's qualifications.   That evidence includes training certifications, beginning in 2009, and the underlying training records from 2013, which have been

44

provided to the defense.[14]   Because the sniff resulted in a positive alert by a reliable canine, law enforcement had probable cause to search McLean's vehicle.   As a result, this aspect of the Fourth Amendment claim also fails.

## IV.   <u>CONCLUSION</u>

In short, the government obtained cell-site information pursuant to two Orders based on proper findings of probable cause by judges of the Circuit Court for Baltimore County.   Those Orders permitted law enforcement to receive prospective cell-site information of precisely the sort obtained prior to the stop of McLean's vehicle on March 18, 2014.   However, even if this Court were to conclude that the Orders are deficient for any of the reasons that McLean identifies, law enforcement plainly acted in good faith in relying on the Orders and on underlying state and federal statutes in obtaining the cell-site information.   Further, the traffic stop of McLean on March 18, 2014 was fully compliant with the Fourth Amendment.   Accordingly, the government respectfully requests that the Court deny the defendant's motion to suppress in its entirety.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By: _____/s/_____
Christopher J. Romano
Matthew C. Sullivan
Assistant United States Attorneys
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

_____

[14] In the event that McLean is pursuing such a challenge, the government is prepared to offer further evidence at the motions hearing establishing Zigo's reliability.

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2014, the government's Response to Defendant

McLean's Motion to Suppress Evidence and the accompanying exhibits were electronically filed

and served on opposing counsel using CM/ECF.

_____/s/_____

Matthew C. Sullivan